**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MONIQUE B.,

                Plaintiff,

     v.

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

Case No. 19 C 652

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Monique B.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Monique asks the Court to reverse and remand the ALJ's decision, and the Commissioner moves for its affirmance. For the following reasons, Monique's motion [15] is granted in part and denied in part, and the Commissioner's motion [22] is denied. For the reasons set forth below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

Monique, now 54 years old, worked as an appointment clerk at a hospital in Wisconsin until July 2015, when she relocated to Illinois to take care of her ailing father. (R. 70-71, 221). Directly prior to leaving her job, Monique reported to doctors that she

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

was suffering from body aches, feet pain, sweating, itching, a sensation of confusion, and ankle edema. *Id.* at 359. Monique was assessed at that time as having leg swelling, essential hypertension, and morbid obesity. *Id.* at 357. Monique's medical record likewise indicates that she has suffered from various other conditions, including osteoarthritis of both knees, chronic lower back pain, scoliosis and spondylosis of the spine, and major depressive order. *Id.* at 397, 476, 479-504, 709, 717, 724, 729. To treat those conditions, Monique has, among other things, undergone knee injections and utilized prescription pain medications including Tramadol and Hydrocodone-acetaminophen. *Id.* at 287, 290, 334, 744.

In July 2015, Monique filed her application for disability insurance benefits, claiming she became unable to work at age 49 due to high blood pressure, arthritis, and degenerative joint disease. (R. 94). Monique alleged that her disability began on July 15, 2015. *Id.* at 94, 112. Monique's claim was initially denied on November 24, 2015, and upon reconsideration on April 22, 2016. *Id.* at 112, 113. Upon Monique's written request for a hearing, she appeared and testified at a hearing held on September 12, 2017 before ALJ Michael Pendola. *Id.* at 54-93. At the hearing, the ALJ heard testimony from Monique and a vocational expert, Mary Schmit. *Id.*

On January 3, 2018, the ALJ issued a decision denying Monique's DIB claim. (R. 36-53). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Monique had not engaged in substantial gainful activity since July 15, 2015, the alleged onset date. *Id.* at 41. At step two, the ALJ found that Monique had the severe impairments of dysfunction of major joints (arthritis of the knees); degenerative disc disease; and obesity. *Id.* At step three, the ALJ determined that Monique did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id.* at 43-44.

The ALJ then concluded that Monique retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except:

> she can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs but can never climb ladders, ropes and scaffolds.

(R. 44). Based on this RFC, the ALJ determined at step four that Monique could perform her past relevant work as an appointment clerk. *Id.* at 48. Because of this determination, the ALJ found that Monique was not disabled. *Id.* The Appeals Council denied Monique's request for review on December 10, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to

be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano*, 556 F.3d at 562; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and h[is] conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

4

Monique raises three issues in support of her request for reversal of the ALJ's decision: (1) the ALJ did not build an accurate and logical bridge from the evidence to his physical RFC assessment; (2) the ALJ failed to properly evaluate Monique's mental impairments; and (3) the ALJ committed multiple errors in evaluating Monique's symptoms. *See* Doc. [15]. While Monique has failed to identify any errors meriting remand with respect to the logical bridge of the physical RFC and evaluation of Monique's mental impairments, Monique has highlighted significant problems with the ALJ's subjective symptom analysis. Specifically, the ALJ discounted Monique's credibility based on an exercise recommendation, overemphasized her activities of daily living, and discredited Monique based on his unsupported, lay perception that Monique's treatment was conservative. The Court accordingly remands the ALJ's decision because the subjective symptom analysis in this case was patently wrong.

## A.    Subjective Symptom Analysis

Beginning with Monique's winning argument, she asserts that the ALJ committed a multitude of errors in assessing her symptom allegations. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citation omitted); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citation omitted) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors,

medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-*8 (Oct. 25, 2017). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotation marks and citation omitted). And "[n]ot all of the ALJ's reasons must be valid as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (citations omitted).

The ALJ in this case found that the record did not support Monique's claims of disabling impairments. Initially, the ALJ stated that while Monique's impairments were corroborated by diagnostic findings, those diagnostic findings also showed that her impairments were "mild" or "moderate." (R. 45). The ALJ also observed that Monique often presented to her healthcare providers with "insignificant musculoskeletal symptoms." *Id.* Next, the ALJ surmised that Monique's treatment history was "quite conservative, consisting of medication and physical therapy with no healthcare providers determining that she requires further assessment or surgical remedies." *Id.* The ALJ further discounted Monique's credibility in light of a doctor's recommendation that she walk 10,000 steps per day, Monique's purported reporting of significant relief following knee injections, and her activities of daily living. *Id.* at 45-46.

Monique's challenge to the ALJ's subjective symptom analysis highlights at least three mistakes, discussed below. Cumulatively, these errors require remand here. The Court is mindful that credibility determinations by the ALJ are given great deference. *See Murphy*, 759 F.3d at 815-16. However, Monique has identified multiple errors in the ALJ's

subjective symptom analysis in this case, errors that the Seventh Circuit continually takes issue with.

### 1. 10,000 Steps Recommendation

The ALJ noted, that "despite [Monique's] allegations of disabling back and knee pain, she was advised to exercise every day and to walk 10,000 steps daily, the equivalent of five miles." (R. 45-46). Monique argues that recommended exercise is not inconsistent with a claimant's alleged limits, unless the claimant has alleged that she could not do any exercise at all. Doc. [15] at 12. Monique also asserts that before relying on the exercise recommendation, the ALJ should have asked Monique whether she actually walked the recommended 10,000 steps. *Id.*

Courts in this Circuit disfavor the discounting of a claimant's allegations of pain in light of a physician recommendation that the claimant exercise. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) ("Since exercise is one of the treatments that doctors have prescribed for Carradine's pain, and she does not claim to be paralyzed, we cannot see how her being able to walk two miles is inconsistent with her suffering severe pain."); *Clifford*, 227 F.3d at 872 (plaintiff's walking to get exercise at her doctor's suggestion did not undermine or contradict her claim of disabling pain). *See also Banks v. Berryhill*, 2017 WL 4150618, at *11 (N.D. Ill. Sept. 19, 2017) (holding the fact that plaintiff's treating physician "*recommended* Plaintiff engage in activities such as walking, swimming, or riding a stationary bicycle as tolerated does not undermine Plaintiff's reported symptoms and limitations, and it was improper for the ALJ to rely on exercise, as a form of therapy, to discredit Plaintiff's statements.") (emphasis in original).

Here, Monique is correct that the ALJ impermissibly discounted her pain allegations in light of an exercise recommendation. While it may seem surprising that a doctor would recommend five miles of daily walking to a person suffering from disabling knee and back pain, a recommendation to exercise does not make a claimant's claims of pain false. Indeed, the treatment records containing the exercise recommendations cited by the ALJ also reflected Monique's serious knee pain. For instance, in October 2015, Dr. Kandula saw Monique for a comprehensive medical evaluation. (R. 414). At the end of the evaluation, Dr. Kandula assessed Monique as suffering from morbid obesity, pre-hypertension, diabetes, breast cancer, and knee pain. *Id.* at 417. Dr. Kandula then provided plans specific to those ailments. *Id.* at 417-18. While the doctor did advise daily exercise with 10,000 steps per day to combat Monique's obesity, the ALJ also recommended that, with respect to Monique's knee pain, she engage in "[a]ctivity as tolerated." *Id.* at 417. Similarly in November 2015, Dr. Kandula's treatment record included the 10,000 steps recommendation while also counseling Monique to only engage in "[a]ctivity as tolerated," in light of her knee pain and back pain. *Id.* at 492, 493. The treatment records including the exercise recommendations cited by the ALJ are thus largely consistent with Monique's claims of pain.

Moreover, a recommendation to exercise is just a suggestion; it is not evidence that the claimant actually exercised. Here, there is no evidence that Monique walked five miles a day, and the ALJ did not inquire further. In fact, the record demonstrated the contrary. For instance, in a function report from February 2016, Ms. Brown noted that she could walk only half a block before stopping to rest. (R. 285). Monique also reported ambulating issues to her doctors, even conveying at one point that she was using crutches to get around.

*See id.* at 479, 505. At her initial rheumatology appointment, Monique reported an exercise tolerance of less than two blocks due to knee pain, and was described by the doctor as having an antalgic gait, which connotes pain caused by weightbearing. *Id.* at 513, 515. *See Skutnik v. Colvin*, No. 13 CV 7467, 2015 WL 151386, at *3 n.5 (N.D. Ill. Jan. 12, 2015) (citation omitted) ("An antalgic gait is 'a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side.'"). As a result, it was improper for the ALJ to discount her pain allegations based on the 10,000 steps recommendation.

### 2.    Activities of Daily Living

Monique further objects to the ALJ's analysis regarding Monique's activities of daily living. Doc. [15] at 14-15. While daily activities may be used to discredit a claimant's testimony, *see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted), the Seventh Circuit has denounced decisions which fail to recognize the "critical differences" between activities of daily living and activities in a full-time job, such as flexibility in scheduling, getting help from others, and not being held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). *See also Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (remanding where claimant's ability to do limited work to maintain his small farm did not adequately support ALJ's conclusion that he would be able to work full time). "Without acknowledging the differences between the demands of such activities and those of a full-time job, the ALJ [is] not entitled to use [the claimant's] performance of life activities as a basis to determine that [his] claims of a disabling condition [are] not credible." *Ghiselli v. Colvin*, 837 F.3d 771, 777-78 (7th Cir. 2016). For instance in *Cullinan v. Berryhill*, the Seventh Circuit remanded the decision of

an ALJ who drew an "impermissible inference[]" by relying on a claimant's ability to perform household chores without explaining "why doing [the] household chores was inconsistent with [claimant's] description of [ ] pain and limited mobility," and where no inconsistency was obvious. 878 F.3d 598, 603-04 (7th Cir. 2017).

Monique's function report suggested fairly restricted activities of daily living in this case. In the daily activity section of her report, Monique described sitting on the side of her bed in the morning, going to the restroom for grooming, going to the kitchen to cook or warm up food, as well as reading and listening to music. (R. 281). As to the last, Monique stated that she could read and listen to music sitting up for a while but then she would need to lie down. *Id.* She reported that the pain in her hip, lower back, and knees could make sleeping very uncomfortable. *Id.* In terms of personal care, Monique said that it took her longer than before her impairments to get dressed, that she must sit on a chair to bathe, and that she uses wigs for her hair care. *Id.* With respect to meals, Monique stated that she prepared baked foods or foods that do not require standing for long periods of time and that she only prepares foods three to four times a week. *Id.* at 282. Monique also relayed that she did dishes, some light dusting, and small laundry loads three to four times a week, but that she needed help with larger loads of laundry. *Id.* "As necessary," for doctor appointments, groceries, laundry, and sometimes church, Monique would drive or ride in a car. *Id.* at 283. She would shop for food and household products two to three times a month and could handle her money. *Id.* When asked what her hobbies and interests were and how often and well she did them, Monique wrote that she liked reading, crossword puzzles, journaling, cards, and board games, and that she did those things "[r]andomly and good." *Id.* at 284. Yet, she clarified that since her impairments, "[s]itting

for long periods of time can be very uncomfortable." *Id.* With that same "random" frequency, Monique talked to people on the phone. *Id.* at 284. She also said that she would go to church once or twice monthly. *Id.*

Monique's testimony likewise reflected limited daily activities. Monique testified that she began experiencing numbness and tingling in her left hand causing her to drop things, such as a dish towel when trying to wash dishes. (R. 65-66). The pain in Monique's neck caused her to struggle with brushing her hair. *Id.* at 66. She said that she cooked things that are "very very simple," such as "a pot of soup, sandwiches," or something she can "pop in the microwave or the oven" without having to stand for long periods of time. *Id.* at 67. As discussed below, Monique also testified that she changed positions throughout the day, and that she elevated her legs. *Id.* at 67-68.

The ALJ nevertheless concluded that Monique's daily activities were "less limited than one could reasonably expect, considering her allegations of disabling physical and mental impairments." (R. 46). In support, the ALJ recited Monique's ability to groom herself, prepare quick meals, take her medication without reminders, perform some light housework, leave the house unaccompanied, shop in stores, and handle her finances. *Id.* The ALJ also noted Monique's spending time with others, talking on the phone, and attending church. *Id.* The ALJ similarly discussed Monique's engagement in "concentration-intensive hobbies," such as watching TV, reading, completing crossword puzzles, and journaling. According to the ALJ, Monique's driving of an automobile suggests not only that she "possesses adequate attention, concentration, judgment, spatial reasoning and hand-eye coordination but also [that she] possesses the manual dexterity

required to open the vehicle door and turn the steering wheel, the foot dexterity required to operate the pedals and the stamina to sit in the driver's seat." *Id.*

This daily activities credibility assessment is problematic for at least three reasons. First, the ALJ exaggerated and overemphasized Monique's activities without acknowledging the differences between such activities and the ability to sustain fulltime work. For instance the ALJ's analysis suggests that Monique prepares meals, performs housework, leaves the house, and shops on a daily basis. In reality, Monique said that she can do "very very simple" meals and light housework three to four times a week, she only leaves the house "[a]s necessary," and she shops for groceries three to four times a month. (R. 282-85). In a related manner, the ALJ disregarded Monique's limitations in performing these activities. As the Commissioner concedes, the ALJ did not discuss Monique's reported qualifications in assessing her activities of daily living. Doc. [22] at 12. The ALJ thus did not acknowledge the fact that it takes longer for Monique to get dressed or that she needs to use a chair for bathing. *Id.* at 281. The ALJ also appears to have missed the numbness and tingling in her left hand that Monique reported caused her to drop things, like a dish towel or cell phone. *Id.* at 65-66. The ALJ's discussion of daily activities was therefore improper in part because the ALJ exaggerated Monique's daily activities and failed to consider the qualifications on those activities. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("an ALJ cannot disregard a claimant's limitations in performing household activities"); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) ("The ALJ ignored Craft's qualifications as to he carried out those activities . . . . Each activity left him exhausted.").

Second, the ALJ failed to explain why Monique's reported daily activities were inconsistent with her knee, back, and neck impairments. An ALJ must "explain the inconsistencies between [a claimant's] activities of daily living . . . complaints of pain, and the medical evidence." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ here did not explain how Monique's ability to groom herself, prepare some quick meals, or take her medication without reminders, etc., was inconsistent with her claims of severe pain arising from her arthritis in the knees, cervical radiculopathy, and degenerative disc disease. And, perhaps more importantly, no inconsistencies are apparent. For instance, Monique's report that it takes her longer to dress, that she sits in a chair to bathe, and that she struggles through the neck pain when she has to brush her hair (she uses wigs for low maintenance haircare) is consistent with her allegations of severe neck, back, and knee pain. So too, is Monique's ability to prepare quick meals three to four times per week. Importantly, Monique reported that she only cooked things that she could "pop in" the oven or microwave, without having to stand over and watch. (R. 67). That reported activity is consistent with her claims that standing for long periods of time aggravates her knee arthritis. As another example, Monique's ability to do some dusting, dish washing, and light loads of laundry three to four times a week is not inconsistent with her claims of disabling pain. To sustain full-time employment, Monique needs to be able to remain on task, with limited breaks, and perform to specific standards. *See Bjornson*, 671 F.3d at 647. Monique's ability to spend around 30 minutes to an hour and a half helping her daughter with housework three to four times a week does not indicate that Monique could hold down a fulltime job, and the ALJ fails to explain how that light housework was inconsistent with

her subjective symptom allegations. The ALJ's daily activity analysis was therefore erroneous. *See Cullinan*, 878 F.3d at 603-04.

Third, the ALJ failed to construct an accurate and logical bridge with respect to Monique's driving. The ALJ made quite a leap in this case, determining that from Monique's driving a car three to four times a month for groceries, doctors' appointments, and church, that Monique "possesses adequate attention, concentration, judgment, spatial reasoning and hand-eye coordination [and] also possess[es] the manual dexterity required to open the vehicle door and turn the steering wheel, the foot dexterity required to operate the pedals and the stamina to sit in the driver's seat." (R. 46). By the ALJ's logic, anybody who has driven a car has "adequate" attention, concentration, judgment, and more, just by virtue of having driven a car. Significantly, the ALJ does not cite to any medical professional for this proposition, and the Court was unable to find any medical opinion in the record supporting the ALJ's conclusion. As a result, the ALJ's supposition about Monique's driving appears to be an unsupported lay opinion. Plus, the ALJ's deduction is unclear. The ALJ did not explain how Monique's limited driving required the same attention, concentration, and stamina as is required in a full-time competitive job. As a result, Monique's undue weight on Monique's driving cannot stand. *See Skubisz v. Colvin*, 12 C 10320, 2014 WL 4783851, at *9 (N.D. Ill. Sept. 24, 2014); *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015). *See also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The Commissioner argues that the ALJ did not improperly equate Monique's activities of daily living to the ability to sustain fulltime work. According to the Commissioner, there is a critical difference between the ALJ wrongly saying that a claimant can perform this range of activities, therefore she can work, and an ALJ

14

reasonably saying that the claimant can perform this range of activities, therefore she can do more than she claims and is not credible. Doc. [22] at 13.  That is true, and the Court acknowledges that the ALJ's opening sentence was merely that Monique's daily activities were "less limited than one could reasonably expect, considering her allegations of disabling physical and mental impairments." (R. 46). *See Kuykendoll v. Saul*, 801 F. App'x 433, 439 (7th Cir. 2020) (noting similar language and concluding: "This is hardly equating the activities with the ability to work full time").  However, that boilerplate language does not save the ALJ's daily activity analysis here, where the ALJ followed up the harmless language with the harmful equating of Monique's driving ability to the ability to sustain full-time work.  Here, the ALJ did not make the reasonable statement that Monique's ability to drive shows that she is less limited than she alleged and therefore not credible. Instead, he made the improper statement that her driving shows that she possesses "adequate" attention, concentration, judgment, spatial reasoning, hand-eye coordination, foot dexterity, and stamina. (R. 46).  The Commissioner's response therefore fails to save the ALJ's problematic daily activities analysis.

### 3. Conservative Treatment

Finally, Monique argues that the ALJ improperly characterized her treatment as conservative in nature. Doc. [15] at 15-16.  The ALJ here stated: "Her treatment history has been quite conservative, consisting of medication and physical therapy with no healthcare providers determining that she requires further assessment or surgical remedies." (R. 45).

"While it [is] reasonable for the ALJ to consider conservative treatment in assessing the severity of [a] condition," he should cite medical evidence about what kind of treatment

would be appropriate. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (citation omitted). An ALJ, moreover, may not "play doctor" or reach his own independent medical conclusion without support from the medical evidence. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

The Court agrees with Monique that the ALJ was wrong in this case to discount her credibility based on his perception of her treatment as conservative. The ALJ did not cite to any doctor of record describing Monique's treatment as conservative, so it appears the ALJ came up with that characterization on his own. One of Monique's doctors did report discussing conservative measures for her knee pain during a couple of rheumatology appointments, but those measures did not include the knee injections Monique received: "Conservative measures were explained including exercises, warm compresses and local [B]engay cream." (R. 511, 518). In his conclusion regarding Monique's conservative treatment, the ALJ seemed to gloss over those knee injections, which have been considered non-conservative by the Seventh Circuit. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (noting that steroid injections belied ALJ's conclusion that claimant was being treated conservatively). *But see Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (characterizing physical therapy and epidural steroid injections as "conservative"). More troubling is that the ALJ misstated the record when he said that no healthcare providers determined that she needed further assessment or surgical remedies. Monique's latest medical records from the relevant time period showed that she was asked to go to her primary care physician and other doctors for follow-up appointments, ostensibly so that her healthcare providers could keep an eye on her knee, back, and neck impairments. (*See, e.g.*, R. 696, 741). And at least one doctor concluded that Monique would need knee

replacement surgery in the future. *Id*. at 507. The ALJ's conclusion that Monique's treatment was "quite conservative" is accordingly not a valid basis of support for discounting Monique's credibility.

In summary, the ALJ's subjective symptom analysis was erroneous in at least three ways. The ALJ improperly discounted Monique's credibility based on a physician recommendation to walk 10,000 steps a day. The ALJ exaggerated and overemphasized Monique's activities of daily living, without explaining the inconsistencies, and without building the requisite bridge regarding Monique's driving. Finally, the ALJ discredited Monique in light of his lay perception that her treatment was conservative in nature, while misstating the record regarding her need for follow-up appointments and surgery. The cumulation of these errors shows that the ALJ's subjective symptom analysis in this case was patently wrong. That erroneous symptom analysis was not harmless, "as it informed several aspects of the ALJ's findings with respect to [Monique's] residual functional capacity and consequently her ability to perform past relevant work or to adjust to other work." *Ghiselli*, 837 F.3d at 779. The ALJ's credibility assessment in this case, at the very least, contributed to his decision to omit mental limitations from Monique's RFC and his conclusion that Monique did not suffer from disabling back and knee pain. Monique's case must therefore be remanded. While Monique's case turns on the ALJ's erroneous credibility assessment, the Court nevertheless considers her weaker contentions in the following discussion.

## B. Accurate and Logical Bridge for Physical RFC

Monique argues that the ALJ failed to construct an accurate and logical bridge from the evidence to his physical RFC assessment in three ways. First, by according great

weight to the opinion of Dr. Reddy, the only physician to opine on Monique's functional limits, without fully crediting Dr. Reddy's opinion that Monique could perform light work, Monique argues that the ALJ faced an evidentiary deficit, which he filled with his own lay assessment. Doc. [15] at 6-7. Second, Monique contends that the ALJ did not address the impact of her obesity on her ability to sit for prolonged periods. *Id.* at 7-8. Third, Monique claims that the ALJ failed to address Monique's need to elevate her legs and lie down during the course of the day, as well as Monique's testimony that she alternated her positions all day from sitting to standing to lying down. *Id.* at 8-9. Each of Monique's three arguments fails to raise a reversible issue with respect to the ALJ's physical RFC analysis.

### 1. Evidentiary Deficit

When weighing the medical opinions in the record, the ALJ characterized the state agency medical consultant, Dr. Ranga Reddy, as opining that Monique could perform light work with exertional and postural limitations. (R. 47). The ALJ then gave "great weight" to Dr. Reddy's opinion. *Id.* Monique argues that because the ALJ limited Monique to sedentary work in the physical RFC that the ALJ implicitly found that Dr. Reddy "did not account for [Monique's] functional restrictions and that she was more significantly limited than what the State agency physician [ ] found[.]" Doc. [15] at 6. According to Monique, once the ALJ rejected Dr. Reddy's opinion, the only doctor to provide a physical RFC assessment, the ALJ faced an evidentiary gap. *Id.* Monique then avers that the ALJ filled the evidentiary gap with his own lay assessment. *Id.* at 7.

An ALJ who denies benefits must build an "accurate and logical bridge from the evidence to her conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). An ALJ

is not allowed to "play doctor" or use lay opinions to fill evidentiary gaps that exist in the record. *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).

Under some circumstances, an evidentiary deficit can occur if an ALJ rejects each record opinion indicating functional limitations. For example, in the case cited by Monique, *Suide v. Astrue*, 371 F. App'x 684 (7th Cir. 2010), the ALJ discredited the RFC opinions of both the state agency physician and the claimant's treating physician. *Id.* at 688. As a result, the only other relevant medical opinion left to the ALJ in *Suide* was that of a third doctor, whom the ALJ did not discuss, and whose untimely opinion (the claimant subsequently suffered from a stroke and incurred injuries from a fall) did not include a functional assessment of the claimant's abilities. *Id.* at 690. On appeal, both parties argued about the soundness of the ALJ's decision to discount the claimant's treating physician. *Id.* at 689. The Seventh Circuit remanded the decision of the ALJ, holding that it was not the ALJ's evaluation of the claimant's treating physician that required remand, but rather "the evidentiary deficit left by the ALJ's rejection of his reports[.]" *Id.* at 689-90. According to the *Suide* Court, "[t]he rest of the record simply [did] not support the parameters included in the ALJ's residual functional capacity determination, such as an ability to 'stand or walk for six hours' in a typical work day." *Id.* at 690. The Seventh Circuit therefore held that the ALJ's RFC determination was not supported by substantial evidence. *Id.*

Here, there is no *Suide* evidentiary deficit because the ALJ did not actually reject Dr. Reddy's opinion. Monique's claim to the contrary rests on the ALJ's assessment of Dr. Reddy's opinion as limiting Monique to *light* work, whereas the ALJ determined that Monique could only perform *sedentary* work. A closer look at Dr. Reddy's opinion, however, reveals that Dr. Reddy, too, thought that Monique should be limited to sedentary

work. The ALJ's characterization of Dr. Reddy's opinion as signifying light work was therefore likely just a mistake. Significantly, Dr. Reddy opined that Monique could only stand and/or walk for a total of 2 hours and sit for a total of 6 hours in an 8-hour workday, making her unsuitable for light work. (R. 99). *See* SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983) ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time."). Moreover, the state agency determined, based on Dr. Reddy's physical RFC, that Monique demonstrated the maximum sustained work capability for sedentary work. (R. 101). Because Dr. Reddy also found that Monique's RFC indicated sedentary work, there is no classification discrepancy between his opinion and the ALJ's physical RFC.

In fact, the ALJ's RFC is identical to Dr. Reddy's RFC in nearly every respect. The only difference is that Dr. Reddy found that Monique could occasionally lift 20 pounds and frequently lift 10 pounds, whereas the ALJ, by determining Monique's RFC as sedentary, indirectly found that Monique could lift no more than 10 pounds at a time. (*See* R. 44, 99). *See* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). This single lifting distinction between Dr. Reddy's RFC and the ALJ's is meaningless, though, because an RFC is based on the maximum ability of the claimant. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). If Monique cannot stand and/or walk for more than 2 hours in an eight-hour workday, the regulations dictate that she cannot perform light work, regardless of her lifting abilities. SSR 83-10, at *6. Thus, the ALJ did

20

not reject Dr. Reddy's opinion. Rather, the ALJ's RFC is a nearly perfect copy of Dr. Reddy's, and there is no *Suide* evidentiary deficit.[2]

### 2. Impact of Monique's Obesity on Her Ability to Sit for Prolonged Periods

Monique argues that the ALJ failed to address the impact of her obesity on her ability to sit for prolonged periods. Specifically, Monique asserts that the ALJ "failed to address how he determined that the combination of [Monique's] impairments would impact her ability to stand and walk . . . but not her ability to sit." Doc. [15] at 7.

"[W]hile obesity is no longer a standalone disabling impairment, the ALJ must still consider its impact when evaluating the severity of other impairments." *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018) (citation omitted); *Hernandez v. Astrue*, 277 F. App'x 617, 623-24 (7th Cir. 2008) (ALJ must "consider the exacerbating effects of a claimant's obesity on her underlying conditions . . . when arriving at a claimant's RFC."). That is because "[t]he combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately." SSR 19-2p (rescinding and replacing SSR 02-1p), 2019 WL 2374244, at *4 (May 20, 2019); *see also Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.").

The ALJ's decision in this case indicates that he did consider Monique's obesity. The ALJ found Monique's obesity to be a severe impairment at Step Two. (R. 41). Then, in his listing analysis at Step Three, the ALJ acknowledged that the regulations require him

---

[2] In her reply brief, Monique attempts to reframe her *Suide* evidentiary deficit argument as being based on the ALJ's purported failure to point to evidence that supported his RFC determination. Doc. [23] at 2-3. However, Monique's reworking of the argument fares no better. The ALJ did point to evidence supporting his RFC, including x-rays, CT scans, treatment records, and Dr. Reddy's opinion, which the ALJ gave great weight to. (*See, e.g.*, R. 45, 47).

to consider obesity. *Id.* at 43-44.  The ALJ stated that he considered Monique's obesity "in terms of its possible effects on [her] ability to work and perform activities of daily living," and that while he found the claimant's obesity to be severe, the "signs, symptoms and laboratory findings of her obesity are not of such severity as found in any listing." *Id.* at 43, 44.  The ALJ further added that Monique's obesity-related limitations were reflected in the RFC. *Id.* at 44.  In his RFC assessment at Step Four, the ALJ listed obesity as an impairment that Monique experiences and discussed Monique's BMI findings: "She has presented herself with a body mass index (BMI) as high as fifty-four; a BMI of thirty indicates obesity [.]"  *Id.* at 45. Two sentences after that BMI discussion, the ALJ stated that "Due to her impairments, she can perform sedentary work with occasional postural functioning but no climbing ladders, ropes, and scaffolds." *Id.*  In terms of sitting specifically, the ALJ recognized Monique's testimony that sitting or standing for long periods worsens her symptoms but eventually determined that the record did not support Monique's allegations of disabling impairments. *Id.*  Thus, the ALJ appears to have considered both Monique's obesity and her ability to sit.

Monique insists that the ALJ was required to explain why he found the combination of obesity and Monique's other impairments would impact Monique's ability to stand but not her ability to sit. Doc. [23] at 4-5.  In support of this apparent requirement, Monique cites *Liggins v. Colvin*, 593 F. App'x 564 (7th Cir. 2015), *Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009), and *Arnett v. Astrue*, 676 F.3d 586 (7th Cir. 2012).  As an initial matter, these cases appear distinguishable from the facts of this case.[3]  The Court further lacks

---

[3] For example, in *Liggins*, the ALJ's finding that the claimant could sit for six to eight hours was not supported by substantial evidence because the ALJ ignored medical evidence from a treating physician suggesting that the claimant had sitting limitations. 593 F. App'x at 568.  And while the state agency physicians in *Liggins* did opine that the claimant could sit for six to eight hours, the

confidence that these cases require the level of articulation espoused by Monique. However, the Court need not dive into the weeds of these cases, as any error by the ALJ in his obesity analysis was harmless.

The Seventh Circuit has held that even if an ALJ fails to explicitly address a claimant's obesity, any error is harmless where the ALJ predicated his decision upon the opinions of physicians who did consider her weight. *See Hernandez*, 277 F. App'x at 624 (where a claimant fails to articulate how her obesity exacerbates her underlying conditions and further limits her functioning the Seventh Circuit has "repeatedly excused as harmless error the failure of an ALJ to explicitly address the claimant's obesity . . . so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity."); *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

In this case, the ALJ predicated his decision primarily on the opinion of Dr. Reddy, and Monique does not challenge the ALJ's reliance on Dr. Reddy's opinion. Dr. Reddy considered Monique's obesity and explicitly reduced her standing and walking time in the RFC due to Monique's obesity, making any lack of obesity articulation by the ALJ harmless. (R. 100 ("OBESITY: RFC reduced with regard to standing and walking due to inability to sustain. Imaging shows joint spaces are reduced in the R knee.")). Monique's obesity argument thus falls short.

### 3. Need to Elevate Legs and Alternate Positions throughout Day

The other missing blocks in the ALJ's accurate and logical bridge, according to Monique, surround Monique's testimony that she needs to elevate her legs above heart

---

ALJ failed to rely on the state agency physicians' reports. *Id*. Here, there is no doctor of record stating that Monique had limitations in sitting. Furthermore, the ALJ relied on Dr. Reddy, who, as discussed further below, considered Monique's obesity and nevertheless determined she could sit for 6 hours in an eight-hour workday. (R. 99, 100).

level and alternate positions from sitting to standing to lying down throughout the day. Doc. [15] at 8-9. Monique claims that the ALJ neglected to address these needs, and that the ALJ also failed to explain why he did not account for them in the RFC. *Id.*

In crafting an individual's RFC, an ALJ must evaluate all limitations that arise from a medically determinable impairment and cannot ignore a line of evidence contrary to the ruling. *See Villano v. Astrue*, 556 F.3d at 563. The RFC determination should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). While an ALJ need not discuss every piece of evidence, she must still articulate, "at some minimum level," her analysis of the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005) (internal quotation marks and citations omitted); *see Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

Monique has failed to show that the ALJ's discussion of Monique's need for leg elevation was inadequate in this case. The ALJ acknowledged Monique's testimony about her purported need to elevate her legs to reduce edema: "She said that she must elevate her legs above her heart to reduce her lower extremity edema[.]" (R. 45). Subsequently, the ALJ stated that the medical record did not support Monique's allegations of disabling impairments because Monique frequently presented to physicians without edema in her lower extremities. *Id. See, e.g.*, *id.* at 396, 497, 572, 630, 740. Thus the Court can trace the ALJ's reasoning: the ALJ considered Monique's claim that she needed to elevate her legs to reduce edema but rejected the claim because her treatment records indicated she often showed no signs of leg edema.

Monique directs the Court to Monique's April 2017 office visit, in which the examining physician diagnosed leg edema and vertigo and recommended that Monique keep her legs elevated. Doc. [15] at 8. True, Monique did receive a recommendation that she elevate her legs in April 2017. (R. 614). Yet, Monique has failed to demonstrate that the April 2017 recommendation was anything more than a temporary suggestion for her then-present edema and vertigo. At any rate, although the ALJ did not discuss the April 2017 leg elevation explicitly, the ALJ's decision indicates that he reviewed the April 2017 treatment record containing the leg elevation recommendation, and this Court will not reweigh the evidence. (*See* R. 47).

Moreover, the ALJ relied on Dr. Reddy's opinion in forming the physical RFC. Dr. Reddy considered a similar recommendation from a nurse in June 2015 that Monique elevate her legs to reduce swelling. (*See* R. 99, 357). Dr. Reddy nevertheless determined that Monique was capable of performing work, without including a leg elevation restriction. The ALJ's conclusion that Monique could perform her past work as an appointment clerk without having the need to elevate her legs was thus informed by Dr. Reddy's opinion, which the ALJ gave great weight to. Significantly, Monique has not objected to the ALJ's weighing of Dr. Reddy's opinion.

Monique cites to three cases in support of her leg-elevation argument, none of which is persuasive. In the first case cited by Monique, *Chase v. Astrue*, the ALJ found that the claimant could perform sedentary work while elevating his right foot 15 to 20 degrees. 458 F. App'x 553, 556 (7th Cir. 2012). On appeal, the Seventh Circuit determined that remand was required so that further evidence could be introduced about the level of foot elevation required by the claimant. *Id.* at 557. The *Chase* Court specifically took issue

with the fact that the ALJ estimated the degree of foot elevation required when no physician in the record advised that an elevation of 15 to 20 degrees would enable the claimant to perform sedentary work. *Id.* Monique appears to offer *Chase* for the proposition that an ALJ errs in not providing a reason for disregarding a claimant's testimony that she needs to elevate her legs. Doc. [15] at 8. Even if that were a holding in *Chase*, the ALJ did provide a reason in this instance. He discounted Monique's subjective symptom allegations because she often presented to her physicians with no signs of leg edema. (R. 45). The *Chase* case is therefore distinguishable to the facts of this case.

Monique's second case, *Myles v. Astrue*, 582 F.3d 672 (7th Cir. 2009), is likewise inapposite. In *Myles*, the Seventh Circuit found that the ALJ's adverse credibility finding was not supported by substantial evidence, in part, because the ALJ did not articulate his reasons for rejecting the claimant's claims of fatigue and hand limitations. *Id.* at 676-77. In that case, the ALJ acknowledged the claimant's complaints but then simply stated that there was no objective medical evidence to support them. *Id.* at 677. Here, by contrast, the ALJ explained that Monique often presented to her healthcare providers with insignificant musculoskeletal symptoms, such as "showing . . . no clubbing, cyanosis, edema or tenderness in her back, neck or extremities[.]" (R. 45). As a result, the *Myles* case misses the mark as well.

*Cuevas v. Barnhart*, No. 02 C 4336, 2004 WL 1588277 (N.D. Ill. 2004), the third case cited by Monique, is inapplicable as well. In *Cuevas*, the ALJ completely failed to address the issue of pain, as well as the effects of claimant's pain, in her decision, which included the claimant's inability to sleep and resulting need to take naps throughout the day. *Id.* at *15. The claimant's testimony surrounding his pain and need to take naps was

unrebutted in the record. *Id.* The *Cuevas* Court held that to the extent the ALJ found the claimant's testimony to be incredible, the ALJ was required to explain her reasoning. *Id.* The *Cuevas* case is distinct for at least two significant reasons. First, Monique's edema and need to elevate her legs was rebutted by the numerous treatment records indicating she had no leg edema. (*See, e.g.*, R. 396, 497, 572, 630, 740). Second, the ALJ here explained why he did not find Monique's allegations of disabling impairments to be credible: Monique often presented to her physicians showing no signs of lower extremity edema. *Id.* at 45. *Cuevas* is accordingly unhelpful in resolving the leg elevation issue in this case, and does not persuade the Court that the ALJ's leg elevation analysis was inadequate.

Monique's assertion that the ALJ needed to give further discussion on her need to change positions throughout the day also fails. Doc. [15] at 9. In support, Monique names SSR 96-8p and SSR 16-3p, both of which generally require the ALJ to discuss reported symptoms and their inconsistencies with the record. *See* SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."); SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016) ("We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions.").

Here, while the ALJ did not expressly address Monique's testimony that she needed to change positions throughout the day to alleviate her pain, the ALJ did recognize Monique's related claim that sitting or standing for long periods, as well as walking, worsens her symptoms. (R. 45). The ALJ then, contrary to Monique's argument, discussed

why her reported restrictions were not accepted as consistent with the medical evidence by explaining that diagnostic findings showed that her impairments were mild or moderate, and that she often presented to her healthcare providers with insignificant musculoskeletal symptoms. *Id.*

Monique maintains that the ALJ should have addressed the alleged functional restriction, and that "given the objective and diagnostic evidence," the ALJ should have explained why it was unreasonable to conclude that she needed to change positions throughout the day to alleviate her pain. Doc. [15] at 9. But the ALJ did consider the objective and diagnostic evidence, as discussed above. Furthermore, no physician in this case opined during the relevant time period that Monique should change positions to relieve pain. Consequently, Monique's contention that the ALJ failed to build an accurate and logical bridge by not specifically discussing Monique's allegation of needing to alternate positions throughout the day does not hold water.

In short, Monique has not directed the Court to an articulation error worthy of remand in connection with the physical RFC. The ALJ supported the physical RFC with evidence, and the Court can follow the ALJ's analysis in conducting a meaningful review.

## C. Evaluation of Mental Impairments

Monique's remaining argument involves the ALJ's assessment of her mental limitations. In Step Two of the analysis, the ALJ found that Monique's medically-determinable but non-severe impairments of anxiety and depression caused mild limits in concentrating, persisting or maintaining pace. (R. 41, 42). Yet the ALJ did not include any mental health limits in the RFC assessment. *Id.* at 44. Monique contends that the ALJ

consequently failed to properly consider her mental impairments, which were consistently documented in the record. Doc. [15] at 9-10.

When crafting the RFC, an ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. 20 C.F.R. § 404.1545(a)(2). An ALJ must consider mental limitations as part of the RFC assessment because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." *Id*. § 404.1545(c).

Monique suggests that the ALJ failed to properly consider her mental impairments because he found mild limitations at Step Two but then included no related limits in the RFC at Step Four. Yet Monique points to no law requiring the ALJ to include mental limits in the RFC whenever the ALJ finds a mild impairment in an area of mental functioning at Step Two. And while an ALJ must consider limitations and restrictions imposed by an individual's impairments, even those that are non-severe, the RFC need only incorporate limitations supported by the claimant's medical record. *See* 20 C.F.R. § 404.1545(a)(2); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

The Court is not convinced that the ALJ here failed to consider Monique's non-severe mental impairments because the ALJ discussed those impairments throughout his decision. For instance, in his Step Two analysis, the ALJ stated that Monique's mental impairments of anxiety and depression, considered singly and in combination, were non-severe and caused no more than minimal limitation in Monique's ability to perform basic mental work activities. (R. 41). In his RFC analysis, the ALJ recognized Monique's

allegation that anxiety and depression affect her ability to complete tasks and concentrate. (R. 44). The ALJ additionally recalled Monique's testimony that "due to her depression and anxiety, she has a short attention span, mood swings, low motivation and poor sleep. She reported not being able to finish whatever she starts or being able to handle stressful situations." *Id.* at 45. In his weighing of medical opinions, the ALJ discussed GAF scores and gave great weight to Dr. Mehr, who reviewed the mental impairment evidence as of November 2015 and concluded that Monique's mental impairments were non-severe. *Id.* at 46-47. The ALJ also gave great weight to the consultative examiner who noted Monique's normal orientation, memory, and mentation because the ALJ found Dr. Patil's assessment was "corroborated by the evidence in the record remarking on the claimant's unremarkable symptoms." *Id.* at 47.

Monique insists that her treatment records from 2016 to 2017 consistently documented her depressive symptoms. Indeed, those records show that Monique was diagnosed with major depressive order and documented various symptoms reported by Monique, including sleep disturbance, restlessness, irritability, panic attacks, changes in appetite/weight, sleep disturbance, low energy, disinterest in activities, poor concentration, distractibility, racing thoughts, memory impairment and depressed mood. (R. 708, 716, 722, 728). But Monique has not shown how any of those records support a limitation in the RFC. Nor has she suggested what an appropriate limit may be in this case. Regardless, the ALJ's decision shows that he reviewed and considered those records in crafting the RFC. *See id.* at 45, 47. It is not for this Court to reweigh those treatment records.

In short, Monique has not shown that the ALJ's mental RFC construction was unlawful. Monique has not directed the Court to any law requiring the ALJ to include

mental RFC limits whenever a mild impairment at Step Two is found. Nor has she highlighted any treatment records suggesting RFC limits missed by the ALJ. The ALJ further discussed Monique's mental impairments throughout his decision. As a result, the Court cannot say, based on Monique's arguments, that the ALJ failed to properly consider her non-severe mental impairments.

Bringing it all together, Monique has successfully highlighted three significant errors committed by the ALJ in evaluating her credibility, and the Court finds that the cumulative impact of those errors warrants remand. Whereas Monique's arguments regarding the ALJ's construction of an accurate and logical bridge in the physical RFC and his consideration of Monique's mild mental impairments are unpersuasive. In any event, the ALJ's decision is reversed and this case is remanded so that the ALJ can reevaluate Monique's credibility.

On remand, the ALJ must reweigh Monique's subjective symptom allegations without committing the errors discussed in the first section of this Memorandum Opinion and Order. That is, the ALJ must not discredit Monique for merely receiving recommendations to exercise. The ALJ should not exaggerate or overemphasize Monique's activities of daily living, and must explain any inconsistencies he perceives between those activities and her subjective symptom allegations. The ALJ should also refrain from equating Monique's ability to drive or conduct other activities as an ability to sustain fulltime work. Finally, the ALJ should not make unsupported, lay conclusions regarding the aggressiveness of Monique's treatment, and should take care to accurately describe Monique's need for follow-up appointments and surgery.

## **CONCLUSION**

For the foregoing reasons, Monique's motion for summary judgment [15] is granted in part and denied in part, the Commissioner's Motion for Summary Judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated: July 22, 2020

Sunil R. Harjani
United States Magistrate Judge